**Sima FICKS, Plaintiff,**

v.

**Charles Z. WICK, Defendant.**

**Civ. A. No. 86–2193.**

United States District Court, District of Columbia.

April 6, 1988.

Bruce A. Frederickson, Webster & Frederickson, Washington, D.C., for plaintiff.

Diane Sullivan, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Plaintiff Sima Ficks brought this action claiming discrimination on account of national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2000e–17 (1982). She sued Charles Z. Wick in his official capacity as Director of the United States Information Agency (USIA), maintaining she was rejected for employment with the agency because she was born in the Union of Soviet Socialist Republics. The case was tried to the Court from December 7–9, 1987, with closing arguments by counsel on December 18, 1987. The Court concludes that the plaintiff failed to carry her burden of showing that the legitimate, nondiscriminatory reason articulated by the government for her nonselection was pretextual. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Accordingly, the Court shall enter judgment for defendant.

## I. FACTS

Ficks is, and was on January 17, 1986, when she submitted her employment application, a naturalized citizen of the United States, born in the Soviet Union. She applied for a position as Program Coordinator in the Exhibits Service of the USIA but a native-born United States citizen, Katharine S. Guroff, was selected in February, 1986. Within 30 days of her nonselection, Ficks contacted USIA's Equal Employment Opportunity Office and initiated informal counseling. On April 7, 1986, upon completion of informal counseling and within 15 days of her final interview and receipt of notification from the EEO Counselor of her right to file a formal complaint, Ficks filed a formal complaint alleging discrimination on account of national origin. On July 8, 1986, defendant issued a final agency decision and notice of right to sue within 30 days of receipt of the notice. Ficks filed this action on August 7, 1986, within the time permitted by 42 U.S.C. § 2000e–16(c).

The Program Coordinator of the Exhibits Service is responsible for coordinating the recruitment, selection, training, and administrative processing of bilingual American guides, who accompany major USIA exhibits to the Soviet Union and Eastern Bloc countries. The exhibits, arranged under bilateral cultural exchange agreements, represent aspects of American life and culture and are quite substantial undertakings, costing millions of dollars. During the 1970s, the USIA regularly sent exhibits, accompanied by American guides, to the Soviet Union.

As a result of the Soviet invasion of Afghanistan in 1979, the United States cut back on cultural exchanges with the U.S.S.R. and stopped sending exhibits to that country. Relations between the two countries gradually improved and a new cultural exchange agreement was signed in November, 1985; Gregory Guroff, the husband of the person selected for the position in question, was among those negotiating the agreement on behalf of the United States.

The new cultural exchange agreement reinstated the exhibits program, and the USIA's Exhibits Service promptly began to gear up for an exhibit called "Information U.S.A." and to recruit up to a dozen new employees, including a Program Coordinator. In December, 1985, Richard Suib, Chief of the Exhibits Service, requested a vacancy announcement be prepared for the Program Coordinator position. Suib prepared an initial draft of the announcement and gave it to Gail R. Becker, his subordinate as Project Director and herself a former Program Coordinator. Suib and Becker worked with Shelby Lynn Jarman Weilepp, a USIA personnel management specialist, in filling the vacancy.

Suib and Becker sought a GS–12 classification for the Program Coordinator position, but there was some tension between their desires and the personnel classification guidelines. The job was eventually classified as GS–11. The vacancy announcement described the duties of the Program Coordinator as follows:

Incumbent serves on multiple exhibit projects concurrently developing collateral program planning and coordinating the recruitment, selection, training, and programming of bilingual America exhibit guides, specialists, speakers and seminar panels on major USIA exhibitions shown primarily in Eastern Europe and the USSR. Incumbent is responsible for all aspects of administration in relationship to duties.

The vacancy announcement referred to "X–118 Qualification Requirements" and stated that three years of generalized experience and three years of specialized experience were required. Neither the generalized nor specialized experience requirements referred to knowledge of the exhibits medium. The "special rating factors," which come into play only if five agency employees eligible for promotion apply for the job, include this factor: "knowledge of the principles, concepts, and methodologies involved in the exhibits medium." This factor is one of five assigned equal value in the vacancy announcement.

The position description is considerably more detailed than the vacancy announcement and under "knowledge required by the position" includes this requirement: "Broad knowledge of the basic principles, concepts, and methodology of the exhibits medium." The position description stated the Program Coordinator would travel within the United States interviewing guide applicants, and "may also travel overseas" with the exhibits. The ability to speak Russian was not required.

The vacancy announcement was posted on December 31, 1985. The applications were screened by Weilepp, the personnel specialist, and 12 applicants were determined to be "minimally qualified." The names of those applicants were forwarded to Suib, who selected four applicants for interviews, including Ficks, Guroff, Ludmila Foster, and Anne Lowendahl. Becker participated in the interviews as an observer whose comments would be sought later; in fact, her comments were solicited by the selecting official and were a key factor in the selection of Guroff. Lowendahl eventually was selected for another position, that of Guide Recruiter, and Foster, who also was born in the Soviet Union, was not considered for the job when it became apparent during the interview that she was not an appropriate candidate. The only two serious contenders for the job, therefore, were Ficks and Guroff.

Sima Ficks was born in the Soviet Union and lived there until 1972 when, at age 33, she emigrated first to Israel, then to Italy, and finally to the United States. She has an intimate knowledge of Soviet life and culture as well as the ability to speak Russian and Ukrainian as a native. She also has a working knowledge of Polish. Ficks earned the equivalent of a masters degree from Kiev State University in 1964 in linguistics and methods of teaching foreign languages; her formal education includes study in art and art history in 1964 and 1965, plus three graduate level courses at George Washington University in Washington, D.C., in Russian civilization and literature.

While she was a student at Kiev State University, Ficks worked part-time at the Exhibit on Advanced Experience in Ukrainian Economy, a permanent exhibit which included several pavilions. She testified that her job was akin to an information specialist, primarily working in the library reviewing current periodicals for new exhibit material. On occasion in the summer she served as an exhibit guide, conducting tours and answering questions, she testified.

After graduation, Ficks went to work at an advanced school for Air Force engineers, reviewing and translating articles in foreign magazines and journals. She also taught conversational Russian to foreign students at the school. She continued in

this job for eight years, until her authorized departure from the Soviet Union.

Ficks arrived in the United States in September, 1973, and has lived in this country since that time. She became a naturalized United States citizen in June, 1979. Since 1974 she has taught for the Slavic Department and the Continuing Education Program at George Washington University; her courses included Business Russian, Scientific Russian, Readings in the Soviet Press, and the Soviet Union Today. From 1983 to 1985 she was coordinator for a special Soviet Area Studies Program for Government Employees. She has administrative responsibilities for coordinating professors, locating, copying, and distributing materials, and so forth for the Soviet Union Today course. She is an untenured associate professorial lecturer paid from $10,000 to $12,000 a year.

In addition, she has worked as a translator, under contract with the Department of State, at about 20 conferences. She also has worked under contract with USIA in two capacities, one translating English text into Russian for *America Illustrated* magazine, the second for the Exhibits Service (before 1979) translating material, preparing supplementary materials such as vocabularies for guides, and training guides in specialized vocabulary associated with a particular exhibit.

Relevant nonwork experience cited by the plaintiff consisted primarily of her role as executive secretary and treasurer of Litfund, a private organization for the relief of Russian writers and scientists in exile. She arranged speakers, occasionally prepared press releases or advertisements, and so forth. Finally, her other contacts with USIA consisted of private Russian language tutoring of Becker on a number of occasions in the 1970s and once in 1984 or 1985, and the fact that her husband, Lucien Ficks, is employed by the USIA's Voice of America.

Katharine S. Guroff graduated from Goucher College in Baltimore in 1962 with a bachelor's degree in political science. She speaks Russian fluently, having lived there on three occasions and worked in the United States Embassy in Moscow.

Guroff worked as a research assistant to an economist on the minority staff of the Joint Economic Committee of Congress for two years after graduating from college. From 1964 to 1966, while her husband pursued a graduate degree at Princeton University, Guroff worked as a research assistant to two faculty members writing books. In 1966 Guroff made her first trip to the Soviet Union, accompanying her husband, who was participating in a graduate student exchange at Moscow University. The next year she returned to Princeton with her husband and resumed working as a research assistant and secretary to a professor.

From 1968 to 1972 Guroff left the work force to have a family. She worked part-time as a secretary at Grinnell College in Grinnell, Iowa, during this time, which eventually led to a regular 20–hour a week job working for the Dean on research projects involving enrollment, faculty workload, and curriculum. During the 1973–1974 academic year her husband received another exchange student fellowship and she returned to Moscow with him and their two children. On returning to Grinnell in July, 1974, she resumed her research work, this time on a full-time basis, until her husband received a job in Washington, D.C., and the family relocated in July, 1977.

For the next five years Guroff worked for the American Association of Colleges in Washington, D.C. After three months as a secretary she became Membership Coordinator, responsible for recruiting and retaining institutional members. She later became Associate Director, and then Director, of a grants program in which about $300,000 was given to 30 to 35 colleges to enhance their liberal arts programs. She also served as Assistant to the President for development, raising more than $500,000 in corporate and foundation support for the Association's projects. In January, 1982, she became Director of Programs and Institutional Grants, one of the five top staff members of the Association. Her duties included supervising three program

coordinators and reviewing grant applications to decide how the Association's funds would be committed. Also among her responsibilities was organizing and hosting a two-day conference. Her final rate of pay was $25,000 per year.

In August, 1982, Guroff's husband, an economic historian employed by the USIA, was assigned to the U.S. Embassy in Moscow. In the Soviet Union, Guroff found employment opportunities severely limited. The Department of State relied on spouses to fill a number of jobs in the Embassy, but they were low level and low paying. First, Guroff worked as a public access control receptionist for three months, screening persons who entered the Embassy and, as a Russian speaker, inquiring what business they had in the Embassy. She also served as a source of information for Soviet and American citizens coming to the Embassy for various purposes, directing them to the proper office and assisting them with general information.

Seeking a more challenging position, Guroff next worked as a secretary in the press section for nine months, preparing daily news bulletins and official texts released by the Embassy, and assisted when necessary the secretary for the Counsellor for Press and Cultural Affairs. She then became a personnel assistant for about six months, performing secretarial duties, teaching herself to use a Wang word processor, and attempting to organize personnel office files and procedures.

Guroff's final Embassy job, which she held for a little more than a year, was as personnel secretary; this job is classified under the Foreign Service classification system but would be equivalent to a GS–11 or GS–12. The Embassy Personnel Office provided services to 170 Americans and 180 Soviets employed at the Embassy. Guroff testified that her job included secretarial duties, maintaining telephone and diplomatic lists, editing the Embassy newsletter, coordinating catalog mail orders for Soviet employees, translating Soviet traffic regulations, maintaining duty rosters, escorting visitors, and processing personnel paperwork for employees. She was the only employee in the Personnel Office who spoke Russian. She also became involved in Embassy activities associated with the three state funerals of Soviet leaders (Brezhnev, Andropov, Chernenko) which occurred during the period.

Although Guroff had received a two-year leave from the Association of American Colleges, her stay in the Soviet Union lasted three years. When her husband was reassigned to Washington in 1985, Guroff, hoping to continue her involvement in Soviet affairs, accepted a job on the Soviet Desk at the State Department. The job was as a clerk-typist, GS–4 Step 10. Guroff testified credibly and without contradiction that she was told the job would be upgraded, both in terms of GS rating and responsibilities, within 90 days, but that it was the only position available at the time. Taking the job allowed her to continue federal service without interruption and a salary ($16,800 a year) equivalent to what she received in Moscow. In addition to performing secretarial duties, Guroff worked as a program assistant and was one of only two persons in her office who spoke Russian. She was a member of the support staff which traveled to Geneva, Switzerland, for the Summit and to Moscow for a meeting between foreign ministers. However, because her job was not upgraded as promised, Guroff in December, 1985, began to look for another job, which resulted in her application for the Program Coordinator job with the Exhibits Service. She applied for (and received) a Mid–Level Career Rating from the Office of Personnel Management, a rating that reflected her considerable experience and qualified her for the GS–11 position.

Weilepp, the personnel specialist, initially reviewed the applications for Program Coordinator and determined that 12 applicants were "minimally qualified." She testified that she did not feel that experience with exhibits was an absolute prerequisite for the job; consequently, she did not consider any applicant's lack of experience with exhibits a disqualification. The Court was impressed by Weillep's demeanor and considers her a credible witness. She had experience filling vacancies for the Smith-

sonian Institution and knew of the difficulty in obtaining applicants with experience in the quite narrow field of exhibits.

Weillep testified that she relied on a multigroup standard for administrative positions (X–118 Qualifications Requirements referred to in the vacancy announcement) which says this about specialized experience:

Specialized experience is operating administrative, program, or managerial experience in a type of work or a combination of functions directly related to the position to be filled, or in comparable work or functions.

Weilepp relied on this "comparable work" provision to determine that specific knowledge of exhibits was not required and that Guroff and other applicants forwarded to Suib had sufficient experience and skills in comparable areas to qualify. She referred to Guroff's skills in written and oral communications, her experience in administering a grant program, and her broad experience as an administrator and so forth, as providing knowledge transferrable to the exhibits medium. Weilepp also testified that she believed (correctly, as it turned out) that the Office of Personnel Management would approve Guroff for the GS–11 Program Coordinator job despite the fact that Guroff's current GS–4 would ordinarily make the promotion out of reach.

Ficks presented an expert witness in federal personnel administration, Robert L. Davis, who disagreed with Weilepp's conclusion that Guroff was qualified for the job. Davis testified that he read the position description literally and in his opinion Guroff's lack of experience in exhibits disqualified her. Davis, who impressed the Court as rather rigid in his views, apparently discounted Guroff's exposure to exhibits while living in the Soviet Union. Davis testified that unless specialized knowledge of exhibits was a requirement of the job, the Program Coordinator position should be classified at the GS–5 or GS–6 level instead of GS–11. Davis did not offer an opinion on the comparative qualifications of Ficks and Guroff in other respects.

The position of plaintiff is that Guroff was not minimally qualified for the position and her name should not have been forwarded to the selecting official by Weillep. However, there is no evidence that Weillep's decision was motivated by any discriminatory intent. After careful consideration, the Court concludes that the agency could in good faith conclude that comparable work could satisfy the requirement. This conclusion is particularly appropriate if "broad knowledge" is read to mean general knowledge as opposed to detailed knowledge; this reading is consistent with the fact that the Program Coordinator is not a technical specialist in the nuts and bolts of exhibits but a coordinator and administrator. Further, the Court concludes that the agency could in good faith conclude that Guroff possessed sufficient comparable knowledge, skills, and experience to satisfy the specialized knowledge requirement so as to be minimally qualified for the position.

The selecting official, Suib, testified credibly that he chose Guroff over Ficks because he considered her better qualified. The Court has no difficulty finding Suib's statement credible and reasonable. As the Court's lengthy review of the two applicants' backgrounds reveals, they are both attractive candidates with much to offer. Their qualifications derive from quite different experiences, however, and one might be deemed the better qualified if certain skills were highlighted (for example, Guroff has an overwhelming advantage in administrative experience and had personal knowledge of operations at the Embassy in Moscow) while the other would stand out if other skills were highlighted (for example, Ficks has more experience translating and teaching Russian and some experience with exhibits).

The selecting official receives the applications of all those considered minimally qualified but is required to interview only those applicants from within the agency who are designated "promotion eligibles." Applicants from outside the agency, including both Ficks and Guroff in this case, need not be interviewed. Suib decided that

Ficks was among the top contenders for the job, based on the applications, and scheduled her for an interview. The decision to interview her is, of course, not consistent with a decision not to select her because of her national origin, because her application revealed her national origin. The Court considers Suib's decision to interview Ficks as strong evidence of the lack of any discriminatory intent on Suib's part.

Ficks suggests that her interview and events surrounding it reveal a bias or hostility or predisposition that demonstrates a discriminatory intent or shows that Suib's assertion that Guroff was better qualified is mere pretext. The Court cannot agree. First, Ficks was turned down when she attempted to reschedule her interview for her own convenience, but this is explained by the press of Suib's schedule; Guroff's interview was rescheduled slightly, but only to accommodate an out-of-town commitment, and not for Guroff's convenience, as shown by the fact that she was forced to go straight from the airport to the interview.

Second, the Court cannot accept the suggestion that questioning by Suib and Becker about Ficks's ability to travel to the Soviet Union reveals a discriminatory intent or supports a conclusion that Ficks was not selected because of her national origin. In response to the inquiries, Ficks said that as far as she knew the Soviets would allow her to reenter the country. She pointed out that she emigrated lawfully and assumed she would be permitted to reenter. Suib and Becker stated that they accepted Ficks's assessment. (In fact, a number of guide applicants were born in the Soviet Union. Some were hired and have indeed accompanied USIA exhibits to the Soviet Union. This fact contradicts Ficks's suggestion that fears about her ability to return to the Soviet Union caused her nonselection.) All Program Coordinator applicants were asked about their ability to travel within the United States, which was considered essential for the job, and it was not unusual for the question of Ficks's ability to travel to the Soviet Union to come up.

Finally, the Court is not persuaded that Fick's interview was perfunctory. Suib stated that he followed the same format with all of the interviews, reviewing the applicant's background and using specific items in the application as springboards for further discussion. Suib stated that his goal was to get the applicant to discuss himself or herself and to establish a dialogue. Suib, Becker, and Ficks all testified that the Ficks interview never seemed to take off; the most likely explanation is not that Suib conducted the interview differently, but that Ficks was reserved and passive. If Guroff's interview lasted longer than Ficks's, it very likely resulted from her conduct, not from Suib's. Becker, who knew Ficks from her contract work and tutoring and even counseled Ficks on preparing her application and consented to be listed as a reference, testified convincingly that she was not pleased by Ficks's performance in the interview. She described Ficks as "rather contained" during the interview. "As her friend, I was rather disappointed."

The Court had the opportunity to observe plaintiff's demeanor on the witness stand, and to compare the impression she makes with that of Guroff. Ficks displayed a lack of aggressiveness or dynamism as a witness and did not seem to be a "take charge" or self-confident personality. The Court makes this comment not by way of criticism, but merely to explain how a lackluster interview more likely resulted from Ficks's own conduct than from any hostility on the part of Suib or Becker.

Guroff, on the other hand, won the job during the interview, according to the testimony. Becker testified that the selection of Guroff, while made by Suib, was a "mutual decision" that was "quite obvious" after the interviews. The Court was impressed by Becker's review of the strengths and weaknesses of each applicant and finds it not indicative of any bias against Ficks or bias for Guroff. Becker's assessment is particularly important because Becker's more than 20 years with USIA included service as Program Coordinator as well as guide; she was well

equipped to evaluate the qualifications of the applicants against the actual requirements of the job. The two applicants presented different knowledge, experience, and qualities which appear to have been fairly assessed in the selection process.

Among Ficks's strengths were her intimate knowledge of Soviet life; her teaching experience; her ability to speak and teach Russian; and her knowledge of exhibits, though that knowledge is in reality quite limited. Her weaknesses include her general lack of administrative experience; her lack of experience working in the federal government; the lack of what might be described as a "command personality"; and the fact that she had not been in Russia for some 13 years. Guroff's strengths included her knowledge of Soviet life gained from living there on three occasions; her strong administrative background, both with the Association of American Colleges and the government; her ability to speak Russian; and her recent experience at the U.S. Embassy in Moscow, which would be heavily involved in exhibits produced in the Soviet Union by USIA. Guroff's principal weaknesses included her lack of hands-on experience with the exhibits medium.

In short, an objective review of the applications fails to support the lopsided advantage in her favor urged by Ficks to allow the Court to find that her nonselection was based on impermissible factors.

Plaintiff also suggests that Guroff was preferentially treated because of the position of her husband, a Foreign Service Officer specializing in Soviet affairs. In that capacity, he has consulted with the Exhibits Service as a subject matter expert. Mr. Guroff had worked with Suib on occasion as a subject matter expert, and mentioned on one occasion to Suib that his wife had applied for the Program Coordinator position. There is no evidence that Suib was influenced by Mr. Guroff, and the Court finds nothing illegal or improper in Mr. Guroff's conduct.

Ficks's husband also worked at USIA and was involved in the process of his wife's application. In fact, Ficks testified that she learned of the Program Coordina-tor vacancy from her husband, a Voice of America supervisor. Her husband learned of the job through one of two people, Blanche Grudofsky or Helen Murphy, USIA's Equal Employment Opportunity Officer. Upon learning of the vacancy, Ficks called Murphy, whom she apparently knew from past efforts to obtain employment with the USIA.

Ficks met with Murphy in November, 1985, to receive comments and suggestions on her Personal Qualifications Statement, Standard Form 171. Ficks also sought advice and assistance on several occasions from Becker, whom she listed as a reference on her SF–171; Ficks had worked with Becker on Exhibits Service contract work in the past, and had privately tutored Becker in the Russian language. Becker considered Ficks a friend and recommended Ficks's daughter for admission to Vassar College. When Ficks was rebuffed by a secretary in her attempt to reschedule her interview with Suib, she called Becker with the same request, but was told it simply was not possible because of Suib's schedule and the need to fill the vacancy quickly.

At the interview on Tuesday, February 11, 1986, Ficks was told to expect a decision by the end of the week. She testified that on her way out of the building she met Murphy, the EEO officer, in the elevator. She also testified that she called Becker later that day, explaining that she had inadvertently retained her visitor's pass. She obviously was using all avenues possible in an attempt to receive the position. She called Becker at home on February 27, 1986, when she had not heard anything in more than two weeks, and learned another person was selected. Becker testified that Ficks stated at the outset that she might file a discrimination complaint, which had the predictable effect of making Becker and Suib cautious in their dealings with Ficks. The Court finds it instructive that even before learning who had been selected or what that person's qualifications were, Ficks had determined that she was the victim of discrimination; Ficks was particularly interested in learning whether the person selected spoke Russian, as that was

her main strength. The following day, Ficks called Suib's office, but he was out; she spoke to Becker, who declined to discuss the decision further in light of Ficks's announced intention of filing a discrimination claim. Ficks then called Murphy, the EEO officer. Finally on March 7, 1986, she called Suib; when Suib declined to discuss the successful applicant because of privacy considerations, Ficks threatened to file an EEO complaint, which she eventually did.

No evidence was presented of any direct evidence of animosity toward Ficks because of her birth in the Soviet Union. In fact, the selecting official's ancestors came from Russia around the turn of the century, and he displayed no overt hostility toward the plaintiff. Plaintiff adduced absolutely no evidence of any animosity toward her because of her national origin. Finally, the record simply fails to support plaintiff's suggestion that fears about her ability to travel to the Soviet Union were a factor.

## II. LAW

The relevant Title VII law is fairly settled and applies straightforwardly to the facts of this case. It is unlawful to fail or refuse to hire an individual for federal employment because of the individual's national origin. 42 U.S.C. § 2000e–16(a) (1982). Jurisdiction is proper before the Court as plaintiff has fully exhausted her administrative remedies as required by 42 U.S.C. § 2000e–16(c).

To establish a *prima facie* case of disparate treatment, a plaintiff must prove by a preponderance of the evidence that she: 1) is a member of the protected class; 2) applied for the job in question; 3) was qualified; and 4) despite her qualifications, was rejected and another employee not of the protected class was selected. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

Once plaintiff establishes a *prima facie* case of disparate treatment, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for plaintiff's nonselection. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The defendant's burden is one of production, not persuasion. "It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* at 254–55, 101 S.Ct. at 1094–95.

Once the employer rebuts the plaintiff's *prima facie* case, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the defendant were a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093. Plaintiff may demonstrate pretext directly by showing that a discriminatory reason more likely motivated the employer or indirectly by showing the employer's explanation is unworthy of credence. *Id.* at 256, 101 S.Ct. at 1095. "The plaintiff retains the burden of persuasion." *Id.*

## III. CONCLUSION

In this case, Ficks clearly establishes that she is a member of a protected class by virtue of her birth outside the United States, that she applied for the job of Program Coordinator, that she was qualified for the job, and that she was rejected and a native-born citizen of the United States was selected. The defendant successfully rebuts the plaintiff's *prima facie* case by credibly and convincingly asserting that Guroff was selected because of her superior qualifications. Plaintiff's several attacks on the reason offered by defendant fail to carry her burden of persuading the Court that a discriminatory reason more likely motivated the personnel selection or that the reason is unworthy of belief.

Ficks has provided no convincing evidence that the selecting official, Suib, did not believe that she could return to the Soviet Union, much less that he was motivated by such a belief to reject her application. Suib denies that it was a factor, and the Court finds his statement credible and sufficient. Ficks also has failed to show that the proffered reason was merely a smoke screen for preferential treatment of Guroff because of her husband's position at USIA; again, Suib's denial that this was a factor is essentially unchallenged by

Ficks, who was attempting to influence the selection process herself. Finally, the Court concludes that Guroff was qualified for the position in that she has sufficient "comparable" experience to satisfy the specialized knowledge requirement. Thus, Ficks fails to show the proffered reason for Guroff's selection (superior qualifications) was pretextual.

Accordingly, the Court finds for the defendant.